Good morning, Your Honors, and may it please the Court. Todd Borden from the Federal Public Defender's Office, appearing on behalf of the appellant, Adam Herrick. Judge Wardlaw, I'm going to endeavor to save two minutes for rebuttal, and I will make sure to watch the clock. All right. Thank you very much. Mr. Borden? Your Honors, the District Court erred when it denied Mr. Herrick's motion for a sentence reduction because the Bureau of Prisons categorically refused to provide him any form of treatment for his prostate cancer that would preserve his fertility. Under the Guidelines Section 1B1.13b1c, this was a refusal to provide specialized medical care for a condition that would result in a serious deterioration of his health, and that is infertility. And indeed, it was undisputed below that any treatment for his prostate cancer, be it surgery or radiation, would severely damage his fertility. And it was likewise undisputed below that the BOP categorically just refused to provide any form of treatment for his prostate cancer that would also protect his fertility. Could an outside provider come in and provide that, even though the prison couldn't? That question was not explored extensively below, Your Honor, so I'm somewhat having to speculate. I don't think it's in the record. In my experience dealing with the Bureau of Prisons, I'm extremely doubtful that that would be a possibility. Has he asked, and has the BOP denied it? So Mr. Herrick's declaration, which is at Excerpts 68 of the Excerpts of the Record, he indicated that he was told by the BOP that it just wasn't a possibility at all. But I don't know. I don't think the record reflects that he specifically went through sort of the kite process to specifically ask for a fertility treatment, but I really don't think there's any. Maybe you could just clarify for me a little bit of the facts, what happened here. So there was some delay in diagnosing him for his PSA and related diagnostic treatments for that. That's right. But at the local prison, he was actually diagnosed with cancer. Is that correct? He was eventually – so he was bouncing around a little bit within the – Before he went to the – To Butner, yeah. What's it called? FMC Butner, which is a –  Yes. Yes. Before he – but they had diagnosed his condition. Is that correct? They did eventually. Locally. That's correct. I believe he saw an – I mean, I think he had to be transported to a local hospital to see an outside specialist who was an expert urologist. But he did – yeah, that's correct. Right. And then he was – ultimately, he was transferred to Butner. Correct. I should say he was transferred after this instant motion was filed. Right. But he was – but by the time it was argued, the district court seemed to know that he had been at Butner or whatever. That's right. So he was – by the time Judge Orrick had the hearing, Mr. Herrick had been transferred to North Carolina to FMC Butner or Butner. I'm not – don't totally know the pronunciation, which is a medical facility. Right. And he was seen by a doctor there, a cancer specialist. Is that correct? That's right. And then he was given some options, and he was told – he said he wanted to think about it. And they scheduled another appointment for him with a specialist, and he didn't attend. Why not? So, Your Honor, I confess I am not – Wanted to – there's something I read somewhere that he decided he wanted to wait until after Judge Orrick made his ruling. That may be true, Your Honor. I can say – I mean, this is outside the record. He did eventually receive radiation treatment. So, I mean, that is the moral of the story. I've been in touch with his family recently. I mean, that's outside the record. Right. But, yeah, I think he was concerned. I mean, and I think – I mean, there's two ways to look at that. I think potentially he was hoping to be able to – if this motion were successful, he would be able to be released and, you know, pursue treatment on the outside, where perhaps the standard of care would be superior, but also where he could receive fertility-preserving treatments. And I did just want to alert the panel. I came across this as I was preparing for argument, but I think it's important, which is that under California state law, insurers are actually required to preserve – to offer such treatment in situations where you're being treated for cancer, and then as a side effect of that, it would damage your fertility. And I can send a 28-J letter to the panel, but it's Health and Safety Code Section 1374.551. So, you know, I do think this is the sort of case where it's a situation where, you know, there's sort of one standard of care in prison and one on the outside. Well, did anybody tell him in North Carolina that fertility treatment or preserving his ability to have children was a potential – was a possibility? Or did they say it's not – just we don't do that sort of thing? I believe it's the latter, Your Honor. The record below is not super well developed on this point, I want to candidly acknowledge. But, again, it's at the excerpts 134. That's the client's declaration where he states that he was told he could not – that fertility preservation just sort of wasn't on the menu of available treatments within the Bureau. Would the district court have the authority to order that? I mean, I guess this somewhat gets into Ms. Volkar's point about, you know, pursuing Bivens action or some sort of other relief. But, you know, under the remedy we were actually seeking, which was, you know, again, limited to the guidelines in 3582, motion for a sentence reduction, no. I mean, the district court's authority under 3582, which, again, was what we were using, is a sentence reduction or nothing. I mean, obviously the district courts have certain inherent authority to, you know, do certain, you know, to – I don't know that they would or not. I mean, maybe I'm being optimistic there, but – You're right. Maybe it's a 1983 action. I don't know. Yeah.  I mean, and again, the – you know, pursuing the sort of Civil Rights Act – Maybe the district judge could say, well, I'm going to reduce his sentence unless you provide for fertility. Yeah. That would have – I'm not sure we asked for that specifically below, but that certainly would have been a – that would have certainly been a request that I think might have had an effect. Are you saying – you just – I know this is all out of the record, but he is getting the – he chose to have the radiation in prison. He did ultimately, Your Honor. Yes. And he's – I wasn't able to get a legal call with him. Butner is among the more difficult facilities to get one of those. But we've been in touch with his family, and they report that – they report that, yeah, he did – consistent with Ms. Volkar's representation in her brief that he did receive radiation treatment, and he reports that he's having kind of total impotency as a result. He's having – he's experiencing total impotency as a result of the irradiation of his prostate. Is he able to bank his sperm? So that is – so I would point the court to excerpts of Record 134. There's some indication that – I mean, so the preferred treatment would be when sort of things were still functioning in sort of the more traditional way. You can bank your sperm that way more easily. There is some indication that there still is a possibility of extracting sperm directly from the testes. That's much less successful and I think would require use of IVF in the future. So it would be – yeah, I think we are at a point where things are worse because of the treatment he didn't receive. But I don't think it's totally impossible at this stage, although much, much reduced. I see I, for once, have actually saved the two minutes. So I'd like to reserve those.  Good afternoon, Your Honors. Kelly Volkar on behalf of the United States. This court should affirm, because the district court did not abuse its discretion in denying Herrick's motion for a sentence reduction, the only remedy he sought in his 3582C1A motion, also colloquially known as a compassionate release motion, because Herrick only claims one provision of the binding policy statement supports his claim of extraordinary and compelling circumstances, and it does not apply. Herrick presented a serious but treatable medical condition. Judge Orrick did not clearly err in finding that BOP was providing specialized medical treatment when the defendant was transferred to FMC Butner and was immediately met with a competent physician and provided multiple treatment options. In response to Your Honor's questions to my colleagues across the aisle, I want to point that even my friend concedes that all treatment options for prostate cancer involve a risk to fertility. All treatments, any treatment out there, and... Is that in the record? Was Judge Orrick informed of that? Your Honor, since this was not the focus of the hearing below, I believe what was presented in the record was what my colleague across the aisle was also asking for, a treatment plus sperm preservation. And so I believe that is what was presented to Judge Orrick. I do not know to the extent it was made clear that any treatment we're talking about is really two separate procedures, the treatment for the prostate cancer and a separate procedure to preserve fertility. I did not see in the record that was clear. What is in the record, Your Honor, Judge Paez, was a question that you had asked at ER 248, and it's citing to the medical record as an exhibit as well, where Mr. Herrick informed the medical staff at FMC Butner that he wanted to wait until after the hearing before Judge Orrick to pursue treatment. And indeed he did wait until this past summer, at which point he pursued treatment. But back to the fertility point, it's not, as far as I'm aware, a contested point between my friend across the aisle and myself that any treatment of prostate cancer, indeed in speaking to medical professionals, I understand that prostate cancer itself carries risk to fertility, and any treatment that is medically available will carry some risk to fertility. The only thing that I understand my friend across the aisle to be asking for on behalf of Mr. Herrick was that he should have been presented with an additional procedure to preserve his sperm or to preserve, to freeze his sperm, for example. And we would argue the government's position is that that's not what the binding policy statement requires. The binding policy statement that both sides agree applies here says that specialized medical care is not being provided, the specialized care in the form of treatment of prostate cancer was being offered, was being provided, that risks serious deterioration in health or death. Instead, what my friend across the aisle is arguing for is a separate procedure of freezing sperm or maintaining fertility, which would have been a different procedure than what BOP was offering. And the government argues that that is not properly brought in a compassionate release or a sentence reduction motion. There are other avenues if the defendant wanted to pursue those. And to Judge Wardlaw's question, to my colleague, I do know that there is a statute, for example, for BOP to furlough inmates. I don't know if that was pursued. It certainly wasn't discussed at the district court level in this particular case. But I argue that there might have been paths if that was something that was particularly important to pursue that separate procedure. But the government's understanding from talking with BOP is that they provided the same treatment in terms of the prostate cancer that Mr. Herrick would have had the opportunity to access outside of the prison system. And so the question for this court is, did Judge Oreck abuse his discretion in finding that the circumstances presented to him, and the serious but treatable condition presented by Mr. Herrick, whether that decision was an abuse of discretion. And the government asserts it was not. Alternatively, Judge Oreck did not reach the 3553A factors. However, those also support affirming in this case. With that, unless your honors have further questions for me, the government respectfully requests that you affirm in this manner. Thank you. Thank you, counsel. Mr. Borden. Thank you, your honors. I'm going to try to make three brief points. First, on the fertility risk question that was in the record below, it was at 2ER117 and 2ER134. One critical point I'd like to respond to by Ms. Volkar concerns the notion that these are somehow two separate treatments or that the fertility preservation is somehow just some sort of extra treatment on top. And I don't think that's quite right because, you know, as we're indicating, the standard of care for prostate cancer, you know, isn't just to treat the cancer. It's also, you know, as evidenced by that State of California statute I was just citing, it also should take into account fertility preservation. And I think a useful analogy might be, you know, if an inmate had, you know, it's an extreme analogy, but had appendicitis and the BOP was only willing to do the surgery but not use anesthesia, you know, I don't think we could somehow deem anesthesia as just some sort of extra treatment. And so I think it is important to take into account the sort of whole patient situation and the entirety of treatments that are related to that cancer. And we do know that fertility preservation is a core part of the treatment for prostate cancer because it does, the treatment and perhaps the condition itself do damage fertility. So I don't think they're somehow entirely separate. And I think that they're called for under the text of the guideline itself, which requires specialized medical care to be provided if it will result in a serious deterioration of health. The last point is I'd like to respond to concerns sort of the civil rights Bivens constitutional standard. I think if the Court looks to the text of the guidelines provision here, which hasn't been interpreted a lot, it's quite new, there's no indication that it's somehow coextensive with the Eighth Amendment's deliberate and different standard. That's a much, much harsher standard. And I can't imagine the Sentencing Commission would only require courts to act if a defendant was receiving, you know, intentionally constitutionally inadequate care. That's a very high standard. And I think if we look to the text of the guideline itself, it suggests that courts should apply a lower standard when determining what medical care should be received by defendants under this. And with that, I would urge the district court to reverse the district court. All right. Thank you, counsel. The United States v. Herrick is submitted.
judges: WARDLAW, PAEZ, BEA